Good morning, your honors. Good morning. This case is an asylum case and was denied by the immigration judge and then by the BIA on credibility grounds. And the primary reason, well basically the BIA boiled it down to one reason, which was the alleged conflicted testimony between the applicant and his son who has been granted asylum by the service previously. Both father and son were members of the opposition political party, NORUGI, and there was some discrepancy over the son speaking at the meetings and the rallies. It was confusion in the testimony about the difference between the meetings and a rally. The rallies were in open squares called Freedom Square, also known as Independence Square. Any of the discrepancies pointed to by the IJA go to the heart of the claim? In my opinion, no, your honor, because... The heart of the claim is what happened to the father, right? Right, right. Is there any nexus between whether the son spoke at the hearing, at the meeting, or didn't speak at the hearing and what happened to the father? And the harm he suffered? No, your honor. I don't believe so. I mean, the fact that there was a political affiliation is important, but whether he spoke and what was said was really not important. It was stated repeatedly the father was more of a financial supporter of the political party, and the son was more the political outspoken student leader, and then after college on to being an activist. The government offer any evidence at the immigration hearing that suggested that what happened to the father did not occur? No, no. And also the father submitted a political party membership card. There was never any evidence that that was not a valid document. It was accepted in evidence by the court. So I think the establishment of his affiliation with the political party was established. The harm the father suffered was not based upon what the son had said or spoken about. It was based on the father's participation in the political party, the pressure the local officials put to basically steal his store from him because he was an opposition member. And also they were looking for his son after the son came to the United States first. The government, the local officials who were persecuting him came in and basically beat up the father and persecuted him because of the whereabouts of the son. The case as far as this panel is concerned rises or falls on whether there's substantial evidence to support the adverse credibility determination, right? That's correct. If there is, you're sunk. If there's not, you're back in business. Exactly, exactly. You might want to reserve the rest of your time. Yes, I would like to reserve the rest of my time. May it please the court. My name is Christopher Wang, appearing on behalf of the United States Attorney General Alberto Gonzalez. In this case is a fairly straightforward case of an adverse credibility finding by the Board of Immigration based upon specific cogent reasons that go to the heart of the lead petitioner's asylum claim. Tell us how whether the son spoke at a meeting or didn't speak at a meeting goes to the heart of the asylum claim. The heart of the asylum claim, as lead petitioner claims in his asylum application, which I refer to this court administrative record page 218, is that he was persecuted and subjected to all kinds of torments because of his political activities as a party member. He did not limit his activities to merely writing checks out and supporting the party. I'm sorry, looking for a sentence from the government that started something like this. Okay. The reason whether the son spoke at a meeting or not goes to the heart of the claim because. Now finish the sentence. Because it calls into question whether the lead petitioner was a member of the Nor'uvi party and was persecuted because of his political opinion. He produced a membership card, didn't he? I was looking throughout the entire record. I could not find any place in the record where there was. Tell us where that is on rebuttal. But the government is serious in its argument that whether the son spoke at a political meeting or did not goes to the heart of the father's claim. That is what happened to him. That is that is one of the discrepancies that the government. The discrepancy. I'm still looking for you to tell us how it goes to the heart of the claim. Well, there's also an inconsistent. You have to look at both. Go to the next one. Okay. Stick on this one. We believe that a reasonable fact finder could conclude that. That when the son claimed that he never spoke at the public square and the father claimed that he did witness his son speak at the public square, that there is that inconsistency calls into question. What does that have to do with whether he was persecuted, run out of his business, et cetera, because of these forces believing that he was part of this political movement? Well, I believe it would have to do with the the nexus between the harm he claims to have suffered and the reason why he claimed why why he was persecuted. These people didn't come to him and do these things to him because they said we're doing this because your son spoke at a meeting. Did they? They did. In my record is clear. They were doing it because of his affiliation with the group. Right. Well, they were looking apparently looking for his son under one on one occasion and on the other occasion demanded he he turn over his story. I'm not sure. I don't know if there's explicit evidence that they that they that they did that action because he was a member of the Noriega party. It could have been some sort of economic shakedown. I don't know if there's any evidence there in the record that it that it was an economic shakedown. I think it's a shred of evidence to that effect. There's I don't know if there's evidence either way. Your Honor, I think a reasonable fact finder. Well, when you tell me that there's not evidence either way, that suggests to me that there's no evidence. Well, is there even a question in the immigration hearing where the government lawyer said, isn't it true this was because of economic harassment? I don't I don't believe this. I don't I don't believe that that is present in the record. Go ahead. There's a second inconsistency that before you go to the second one. I look at this for the kinds of differences in memory or testimony that are consistent with truthfulness and the kinds that are not. This difference between the father and the son about whether he spoke at a particular rally or not, isn't that the kind of thing that is perfectly consistent with different memories, different concentrations from different witnesses? And even frankly, isn't that the kind of statement that even the same witness at different points in time might remember at one time and not remember it another? Your Honor, we would. Our position is that a reasonable fact finder could conclude that this is not the type of honest mistake. And I would refer the panel to certain other discrepancies that the IG specifically did not identify. For example, the March 2000 incident, the petitioner testified occurred on March the 20th and the son testified occurred on March the 5th. And that's an example of a very minor discrepancy in date that this court has held does not go toward an adverse credibility finding. In fact, the IG did not mention that in his opinion. The IG also mentioned that there was a discrepancy between how long a period of time after the son got out of the hospital, got out of detention following his beating in March 2000, how long he was in the hospital. The son testified it was two weeks. The father testified it was one week. The IG said that's an example of a discrepancy that goes to adverse credibility. The BIA did not mention that. Counsel, that strikes me as the kind of difference in recollection that's perfectly compatible with honesty and good faith. We all get things wrong. Remember the things that are really important. The stuff that's important marks in our memory, but especially another person. I'm just challenged to see how that difference is a mark of falsehood rather than a normal human limitations and discrepancies in memory. My response to that would be not to look at that particular inconsistency in isolation, but look at the other inconsistency, which I'm going to get to right now, which is that the lead petitioner testified that he attended six meetings at an editor's office and he gave very detailed testimony as to the length of the meeting. He said it was about an hour, the number of people who showed up at the meeting, he said 50 to 60, and the frequency of the meetings, monthly. The son was questioned where meetings were held, and he said they were held in the hall of an education center and at a public square. He was also asked flatly, were meetings ever held anywhere else, and he said no. There you've got a flat inconsistency between the testimony of the father and the testimony of the son regarding where meetings were held, which I believe a reasonable fact finder could look at that discrepancy and say, look, if someone's truly a member of an organization and claims to have attended ten meetings, six of which were at this editor's office and gave very detailed testimony as to what took place at those meetings, and that testimony is flatly contradicted by his son, who was granted asylum and deemed credible, that that inconsistency added the inconsistency about seeing his son speak at public meetings could constitute an adverse credibility finding. Maybe the father didn't know everything the son knew. Well, the father, the son, by both testimonies, the son was more involved in the party than the father was. I think both of them agreed about that. And the son was, you know, asked flat out, you know, are meetings held anywhere other than the hall of an education center and the public square? And he said, no, they're not. And that certainly, I think, could lead a reasonable fact finder to conclude that the father was being untruthful about attending the six meetings at an editor's office in which he gave very detailed testimony. I think once you add that to the testimony of the inconsistency regarding whether he saw his son speak at a public square, the son specifically denied speaking at a public square. The son testified live at the father's hearing? I believe he did, yes. Was he asked about the inconsistency you just spoke to? I don't know. I don't think the attorney specifically asked, look, this is what your father testified. What's your testimony on this matter? Isn't our case law pretty clear that if the government doesn't do that, it's an inconsistency that cannot be relied upon? I'm not aware of a case law that specifically states that the government needs to specifically put a witness on notice. I've been doing this for 12 years, and these cases are about half of our docket these days. But my memory of our case law is that if an inconsistency is important enough to deny relief to a petitioner, the immigration judge is under an absolute duty to ask the person about the inconsistency, in this case the government lawyer, to say, your father says there were meetings at X, and you've testified there were meetings that were not meetings at X. Can you explain that? And that never happened, did it? I don't believe, in my view of the record, I do not remember that ever being asked. I believe that they specifically asked questions to elicit an answer that would be very clear as to whether the father was testifying truthfully. But I don't recall them ever asking flat out saying, look, your father testified as to X. Is X the right case? Okay. Anything else? I'm free to answer any questions the panel might have. If not, I'll rest on the briefs. I don't see any. Thank you. Anything you're dying to tell us? Quickly, Your Honor. I've asked that question maybe 30 times. Any time somebody said anything other than no, they got in trouble. You can go right ahead if you want to. Well, in that respect, Your Honor, I'll sit down. Well, Judge Hawkins, I'm anxious to hear whatever he may want to say. No, Your Honor. That's fine. Thank you. The case just argued will be submitted for decision. And we'll proceed from immigration to civil procedure. And we'll consider national paint and coatings versus the South Coast Air Quality Management District.
judges: Hawkins, Paez, Wake